UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHARODD HARGROVE,<br><br>Plaintiff,<br><br>v.<br><br>ANGEL SANTIAGO, et al.,<br><br>Defendants. | Civ. No. 2:14-4754 (WJM)<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

*Pro se* Plaintiff Sharodd Hargrove brings this 42 U.S.C. § 1983 action against several employees of the New Jersey Department of Corrections, in their individual capacities (collectively, "Defendants"). Plaintiff alleges that: certain Defendants retaliated against him for exercising his First Amendment rights, by placing him in temporary closed custody ("TCC"); certain Defendants subjected him to an involuntary strip search in violation of the Fourth Amendment, as incorporated into the Fourteenth Amendment; and that the conditions of TCC violated his rights to due process and to equal protection under the law. Plaintiff also raises several state law claims. Defendants now move for summary judgment on all Counts under Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). Because Defendants are entitled to qualified immunity, their motion is **GRANTED** and the action is **DISMISSED with prejudice**.

### I. BACKGROUND

The following facts are undisputed unless otherwise noted. Since 2005, Defendant Sharodd Hargrove has been civilly committed to the Special Treatment Unit ("STU") in Kearney, New Jersey, a facility jointly run by the New Jersey Department of Corrections ("DOC") and the New Jersey Department of Health Services ("DHS") for the purpose of incapacitating and rehabilitating "Sexually Violent Predators." N.J.S.A. § 30:4-27.26. The events giving rise to this action relate to Hargrove's suspected participation in a smuggling operation along with several other STU residents and former DOC employee Bobby Singletary. On January 3, 2013, a grand jury indicted Plaintiff Hargrove for bribery in the second degree and indicted Singletary for bribery, misconduct and conspiracy. The three other residents of STU were indicted and plead guilty in exchange for their testimony against one or more defendants. Immediately following the indictment, the DOC's Special

1

Investigations Division ("SID") requested that the offending residents be placed in Temporary Close Custody ("TCC"), a form of administrative segregation.[1] He was again placed in TCC in September 2013 while his trial for bribery was ongoing. Hargrove was ultimately acquitted. Singletary was found guilty.

    i.    <u>The Alleged Strip Search of Hargrove</u>

On January 4, 2013, before being placed in TCC, Hargrove and the other indicted residents were strip searched. Hargrove steadfastly refused to consent to the search and demanded that the officers provide probable cause, in accordance with STU guidelines. Hargrove Dep. 60:16-24. According to the Complaint, Hargrove was then handcuffed and taken into a separate room, where Defendants Troman and Salancho demanded that he remove all of his clothing for visual bodily inspection. Compl. ¶ 5.3. According to the Complaint, Defendants Jones, Troman, and Salancho all threatened Hargrove with physical violence. Compl. ¶ 5.5. Hargrove alleges he ultimately submitted to the strip search because he feared for his safety. Defendants deny that Hargrove was strip searched, though concede that the Court must assume that the strip search took place for the purposes of summary judgment. Defendants claim that Hargrove was searched only by use of a B.O.S.S. chair, a device which scans the body for hidden metal objects. No contraband was recovered. Hargrove does not allege that he sustained any physical injuries as a result of being searched.

    ii.    <u>First Placement in TCC (January 2013)</u>

Based on a recommendation from the DOC's Special Investigations Division ("SID"), Defendant Santiago ordered that Hargrove and the other indicted residents be placed in TCC. Hargrove remained in TCC for roughly one and a half weeks. Lynch Decl., Ex. A, 70:13-20; Defs.' Statement of Undisputed Facts ¶ 9. Normally, defendants are processed at a county jail. In this case, however, the requirement that the DOC separate SVPs from other inmates created practical impediments to transferring Hargrove to county jail. Lynch Decl., Ex. A 77. During his stay in TCC, investigators from SID visited Hargrove in order to elicit a written confession regarding the bribery charge. Hargrove was read his Miranda rights and declined to sign a written confession.

Hargrove alleges that, while in TCC, Defendants deprived him of soap and other toiletries, that he was permitted to shower only twice, and that he was denied legal phone calls and access to legal resources. He alleges that he requested legal phone calls every day but was denied, and that some of the guards stationed outside his cell harassed him and

---

[1] The Sexually Violent Predators Act defines "TCC" as "the removal of a resident from the general population, or other assigned status, with restriction to a room in a designated area for a period not to exceed 72 hours." N.J.A.C. 10A:35-1.4.

called him a "snitch." *Id.* at 73:22-23; 77:24-25. He also lost his work assignment, as he was unable to leave his cell.

      iii.    <u>Second Placement in TCC (September 2013)</u>

On September 12, 2013, Defendant Kennedy of DOC's Central Transport Unit, was preparing to transfer Hargrove from STU to court for trial. Resident Fitzpatrick, scheduled to testify for the prosecution, was awaiting transportation in the same holding area as Hargrove. Officer Kennedy overheard Hargrove tell Fitzpatrick "to keep his dam[n] mouth shut [in court]." Hargrove does not deny making this statement, but insists that he made it jokingly. According to Hargrove, Fitzpatrick "tried to tell the judge . . . that it wasn't no problem amongst me and him." Hargrove Dep. 96:20-23. Upon learning of the incident from Officer Kennedy, Investigator Wise nonetheless recommended that Hargrove be placed in TCC until the trial ended in order to prevent witness-tampering. Lynch Decl. Ex. H., Ans. #9. As a result, Hargrove was placed in TCC for a second time on September 12, 2013 until his trial ended on September 27, 2013. During this time, Hargrove was permitted to shower and communicate with his attorney every day. Nonetheless, Hargrove asserts that he was placed in TCC only because certain officers believed he intended to testify against Officer Singletary at trial, and that his placement was therefore retaliatory.

      iv.    <u>Procedural History of this Action</u>

Hargrove filed a complaint *pro se* under 42 U.S.C. § 1983 on July 30, 2014. On March 1, 2016, the Court denied Hargrove's application for *pro bono* counsel in light of his demonstrated ability to engage in motion practice. On September 7, 2016, the Court denied Defendants' motion for summary judgment without prejudice and granted Plaintiff's motion for completion of limited discovery to the extent of 25 written deposition questions to Defendant Tromans pursuant to Rule 31. The Court denied Hargrove's request for additional discovery. Defendants now move for summary judgment.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* The opposing party must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, to withstand a proper motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57.

### III. DISCUSSION

The Court construes the Complaint as asserting five distinct claims. First, Hargrove claims that his September 2013 placement in TCC was a retaliation for Hargrove exercising his First Amendment right to testify in court. Second, Hargrove argues that the strip search[2] conducted on him prior to his initial January 2013 placement in TCC violated the Fourth Amendment as applied to the states through the Fourteenth Amendment. Third, Hargrove claims that his placement in TCC in January and in September of 2013 violated his right to due process under the Fourteenth Amendment. Fourth, Hargrove argues that Defendants violated the Equal Protection Clause of the Fourteenth Amendment. Fifth, Hargrove claims that Defendants violated various provisions of the New Jersey Bill of Rights and Rights of Residents. Although the Court finds that several of these claims would otherwise survive summary judgment, qualified immunity shields Defendants from liability for civil damages. The case must therefore be dismissed.

#### 1. First Amendment Retaliation Claim

Hargrove alleges that Defendants placed him in TCC in September 2013 because they believed Hargrove intended to exercise his First Amendment right to testify against Defendants' former colleague, retired DOC employee Bobby Singletary.[3] In order to prove a retaliation claim, Plaintiff must establish "(1) he was engaged in constitutionally protected conduct, (2) he suffered some 'adverse action' at hands of prison officials, and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action." *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012).

Hargrove's First Amendment claim fails because the facts show beyond dispute that he was not engaged in a protected activity. Hargrove admitted at deposition that he never intended to testify against Singletary, and that Defendants were aware of this fact. Lynch Decl. Ex. A, 121:3-5. Hargrove also admits that Officer Kennedy overheard him tell Fitzpatrick to "keep his dam[n] mouth shut" at trial, just as Kennedy documented in his September 12, 2013 report. This testimony also supports an alternative basis for the "adverse action" taken against Hargrove, and thus undercuts the theory that his

---
[2] The term "strip search" herein refers to the visual inspection of a nude detainee.
[3] Plaintiff alleges that Kennedy and Singletary "shared a casual relationship as corrections officers." Compl. ¶ 6.5.

4

"constitutionally protected conduct was a substantial or motivating factor in the decision to take that action." Indeed, Hargrove seemed to concede at deposition that his September 2013 placement in TCC was *not* an act of retaliation. *See* Lynch Decl. A., 123:22-124:4. No reasonable jury would find that Defendants retaliated against Hargrove for exercising his First Amendment right to testify at trial.

## 2. Fourth Amendment Claim

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, forbids unreasonable "searches" or "seizures." *See* Const. Amend. IV. To determine whether a search was "reasonable" within the meaning of the Fourth Amendment requires "balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Bell v. Wolfish*, 441 U.S. 520, 560 (1995); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982) (applying the balancing test from *Bell v. Wolfish* to involuntarily civilly committed defendant). The strip search in *Bell* occurred when the detainee returned from a contact visit with someone outside the institution, a scenario which presented an opportunity for smuggling contraband into the facility. *Bell*, 441 U.S. at 560. This threat conferred a "strong governmental justification" for invading the detainees' privacy. *See Randall v. Cty. of Berks, Pennsylvania*, 2015 WL 5027542, at *17 (E.D. Pa. Aug. 24, 2015) (citing *Bell*, 441 U.S. at 559). Yet, as the Third Circuit recently instructed, "*Bell* does not categorically uphold all bodily searches in prisons." *Parkell v. Danberg*, 833 F.3d 313, 326 (3d Cir. 2016). When there is no plausible opportunity to smuggle contraband, the state must articulate an alternative basis for the "particular intrusion" imposed on the detainee, in this case a nude visual inspection. *Parkell v. Danberg*, 833 F.3d 313 (3d. Cir. 2013) (denying defendants' motion for summary judgment because there was no apparent penological purpose justifying a detainee strip search). Defendants fail to articulate any particularized basis for the strip search and thus fail to satisfy the Fourth Amendment under the framework of *Bell v. Wolfish*.

Defendants argue that the search was lawful under *Florence v. Board*, which upheld a jail's blanket policy of strip-searching all incoming detainees in the interest of preventing contraband from entering the facility. *Florence v. Bd. Of Chosen Freeholders of Cty. Of Burlington*, 566 U.S. 318, 322 (2012). The Supreme Court held that the policy was constitutional under *Bell v. Wolfish* because the plaintiff's right to privacy was outweighed by the state's "legitimate interest . . . to ensure that jails are not made less secure by reason of what *new* detainees may carry in on their bodies." *Id.* (emphasis added). Yet, the Court's reasoning in *Florence* "proceed[ed] on the understanding that the officers searched detainees prior to their admission to the general population." *Id.* at 325. In contrast, Hargrove was not being processed for intake into a general population, but rather was being *removed* from the general population and placed in TCC, where he had no contact with other residents or inmates. This distinguishes Hargrove's case from *Florence* and from cases within this circuit upholding strip searches of pretrial detainees. *See Cooper v. Sharp*, 2012 WL 274800, at *8 (D.N.J. Jan. 31, 2012) (upholding strip search of SVP returning from "p.m. visits"); *Randall*, 2015 WL 5027542 at *13-14 (upholding strip search of

detainee returning from a court hearing, "which [was] akin to a contact visit that necessitated strip searches in *Bell*").

Alternatively, Defendants argue that the strip search was reasonable in order "to ensure that Hargrove could not self-harm while in segregation." Yet the record contains no evidence that Hargrove in fact posed any threat to himself. Institutional awareness that detainees may resort to self-harm does not license any and all intrusion into a detainee's privacy. Based on the record, neither Hargrove nor Defendants who searched him mentioned anything about self-harm, and there is no evidence to suggest Defendants believed Hargrove would harm himself.

In short, neither of the state's purported interests outweighs the "particular invasion" sustained by Hargrove during the naked visual search. Viewing the facts in a light most favorable to Hargrove, a reasonable jury could find that Defendants' search of Hargrove was unreasonable and in violation of the Fourteenth Amendment. As explained below, however, qualified immunity insulates Defendants from civil liability.

3. **Due Process Claims**

The Fourteenth Amendment protects individuals from punishment without due process. U.S. Const. Amend. XIV. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539 (citations omitted). "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* Hargrove argues that being placed in TCC in January and September 2013 amounted to "punishment." He describes the January 2013 stay as particularly punitive: he was deprived of most of his personal property and hygienic products; permitted to shower only twice in roughly ten days; prohibited from using the telephone or contacting his lawyer; and deprived of the income he would have earned on work assignment. Compl. ¶ 5.10.

The Supreme Court's decision in *Bell v. Wolfish* governs the constitutionality of restrictions and conditions of confinement for pretrial detainees.[4] *See, e.g.*, *Aruanno v. Main*, 2010 WL 251590, at *8 (Jan. 10, 2010). The Third Circuit has "distilled [*Bell*] into the following two-step test: we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard v. Taylor,* 399 F.3d 150, 159–60 (3d Cir. 2005). The record suggests that Hargrove was placed in TCC in January 2013 at the request of Administrator Santiago in order to facilitate a criminal investigation into charges against Hargrove and three other

---

[4] The parties both cite to *Sandin v. Conner*, 515 U.S. 472 (1995), but that case applies only to sentenced prisoners. *See Bistrian v. Levi*, 696 F.3d 352, 374 (3d Cir. 2012); *Fuentes v. Wagner*, 206 F.3d 335, n. 9 at 342 (3d Cir. 2000).

residents, who had been indicted along with a former DOC employee for charges relating to smuggling contraband into the facility. Under these circumstances, the Court finds that segregating Hargrove from the general population was reasonable under *Bell*, given the state's interest in conducting an efficient and safe investigation. 441 U.S. at 559. Further, the conditions themselves were not so "shocking to the conscience" so to give rise to a freestanding conditions-of-confinement claim. *See, e.g. Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999).

Yet there is one defect of constitutional significance in Hargrove's January 2013 confinement in TCC: his inability to contact an attorney. "Inmates must be afforded reasonable access to telephones so as not to infringe the First Amendment or impede meaningful access to the courts in violation of the Fourteenth Amendment." *Richardson v. Morris Cty. Corr. Facility*, , 2006 WL 3000234, at *4 (D.N.J. Oct. 20, 2006). Correctional facilities have broad discretion to restrict telephone access, but they must do so in a way that is "reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539. For the purpose of summary judgment, the Court must accept as true Hargrove's assertion that he was denied legal calls during his first stay in TCC. Lynch Decl. Ex. A., 78:4-6. Further, Hargrove testified at deposition that some officers denied him access because "they was saying that I was a snitch." Lynch Decl. Ex. A., 77:24-25. This supports the inference that Hargrove's telephone restrictions were punitive in nature. Meanwhile, Defendants offer no explanation or justification for denying Hargrove telephone access. Although the state enjoys broad judicial deference in operating its custodial facilities, officials are not entitled to a rubber stamp of constitutionality where they make no effort to justify behavior that needlessly threatens due process. A reasonable jury could find that Hargrove's phone restrictions violated the Fourteenth Amendment's guaranty of due process. As explained below, however, qualified immunity insulates Defendants from civil liability.

Hargrove's second placement in TCC, in September 2013, clearly served the legitimate purpose of separating Hargrove from witnesses in an ongoing trial in which Hargrove was a defendant.[5] Placement of Hargrove in TCC during his trial did not violate procedural due process.

4. **Equal Protection Claim**

Hargrove argues that Defendants Santiago and Wise violated the Fourteenth Amendment's Equal Protection Clause by holding Hargrove in TCC for prolonged periods on two separate occasions. Equal protection claims may be asserted by a "class of one where the plaintiff alleges that she has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment."

---

[5] Further, Hargrove concedes that the conditions in TCC in September 2013 were much less restrictive than in January 2013. He was permitted to shower daily and to communicate freely with his attorney.

7

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quotations omitted). A class –of-one claim succeeds if the plaintiff proves "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

Hargrove's equal protection claim fails because he provides no evidence that he was "treated differently from others similarly situated." The three other residents of STU implicated in the indictment were strip-searched and placed in TCC, just like Hargrove. Hargrove provides no evidence that other STU residents held in TCC following criminal indictments have been released earlier or otherwise treated differently from Hargrove. *See Carson v. Mulvill*, 488 Fed. App'x 554, 563 (3d Cir. 2012). Hargrove leans heavily on N.J.A.C. § 10A:35-1.4, a regulation which limits placement in TCC to 72 hours barring "emergent reasons for extension." Yet this very language implies that the Administrator has discretion to keep individuals in TCC for longer than 72 hours when deemed appropriate. *Id.* Hargrove's equal protection claim cannot withstand summary judgment.

### 5. N.J. State Law Claim

Count IV alleges statutory and regulatory violations of the New Jersey Patient Bill of Rights and Rights of Residents. N.J.S.A. 30:4-24.2 states that "a resident shall not be deprived of a civil right solely by reason of receiving treatment" pursuant to state law, including the Sexually Violent Predators Act ("SVPA"). N.J. Admin. Code § 10A:35-2.1. Hargrove alleges a violation of the "the right to be free from corporal punishment," N.J.S.A. § 30:4-24.2(d)(4); the right "[t]o the least restrictive conditions necessary to achieve the purposes of treatment," *id.* at e(2); and his right to "reasonable continuity of care," N.J. Stat. Ann. § 26:2H-12.8 (West). Lastly, he alleges a violation of his "right to confidential communications" with his attorney and access to court. N.J.A.C. § 10a:35-2.2(a)(3). Unfortunately for Hargrove, Title 10A of the New Jersey Administrative Code does not create a private cause of action for enforcing any of these rights. *Drake v. Muniak*, 2016 WL 1162375, at *7 (D.N.J. Mar. 26, 2016). Defendants' motion to dismiss Count IV of the Complaint is granted.

### 6. Qualified Immunity

Qualified immunity insulates officials from civil damages unless an official violates a statutory or constitutional right that was "clearly established" when the conduct took place. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Courts must therefore determine (1) whether a constitutional violation took place and, if so, (2) whether the right violated was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As explained above, a reasonable jury could find certain Defendants liable under the Fourteenth Amendment for the strip search and for refusing to allow Hargrove to contact his attorney. The analysis now pivots towards whether these official acts violated rights

which were "clearly established." The Court must examine the "objective legal reasonableness of the action . . . in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (citations omitted). "The focus is on whether the law, at the time of the challenged incident, is sufficiently clear to provide[ ] fair warning to the defendants that their alleged conduct was unconstitutional." *Muth v. Woodring*, 666 F. App'x 137, 139 (3d Cir. 2016) (citations omitted). "We do not require a case directly on point before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton v. Sims*, 134 S. Ct. 3, 5, 187 L. Ed. 2d 341 (2013) (citations omitted).

i. The Strip Search

Although constitutionally suspect, Hargrove's right to be free from a strip search before placement in TCC was not "clearly established" at the time it took place. Strip-searching detainees has been found constitutional in many other circumstances. *See, e.g., Bell*, 444 U.S. at 559; *Zalazar v. Stem*, No. 16-1792 (SDW), 2016 WL 7387416, at *4 (D.N.J. Dec. 20, 2016). Defendants' reliance on *Florence*, while misplaced, was not unreasonable. From the perspective of an objectively reasonable officer, Hargrove's "hybrid" status as both a pretrial detainee and a civilly committed "resident" might further obscure the scope of Hargrove's legal rights. Because they did not violate "clearly established" law, Defendants are immune from liability for damages for the strip search.

ii. Restrictions on Telephone Access in January 2013

To the extent Hargrove was constitutionally entitled to contact his attorney during his one-and-a-half week stay in TCC, the Court does not find that such a right was "clearly established" at the time of the alleged violation. In short, there is no uniform rule as to how long a detainee may be held in isolation before due process requires that he or she be allowed access to legal phone calls. "Numerous and sometimes stringent restrictions on personal telephone calls by inmates have been upheld as constitutional." *Richardson,* 2006 WL 3000234, at *5 (D.N.J. Oct. 20, 2006). "Case law suggests that so long as there is not an outright policy that prohibits telephone use by pretrial detainees, any [reasonable] restriction or limitations that serve a legitimate governmental purpose . . . are constitutional under the Due Process Clause." *Newkirk v. Sheers*, 834 F. Supp. 772, 792 (E.D. Pa. 1993). Given the lack of clarity in this area of the law and the substantial deference historically accorded to prison officials, the Court cannot say that Defendants violated "clearly established" law by prohibiting Hargrove from using the telephone while in TCC in January 2013 for a relatively limited period of time. Defendants are immune from liability for damages.

The Court notes that qualified immunity shields state actors only from civil damages, not declaratory relief. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997). The Court declines to issue declaratory relief in these circumstances. *See* 28 U.S.C.A. §§ 2201, 2202. To be clear, the Court does not hold as a matter of law that any Defendants committed

9

a constitutional violation. Rather, it has found that, construing the facts in a light most favorable to Hargrove, a reasonable jury could find that Hargrove's Fourteenth Amendment rights were violated; however, it also found that Defendants are immune from civil liability. *Pearson*, 555 U.S. at 236 (2009).

### IV. CONCLUSION

For the reasons foregoing, Defendants' motion for summary judgment is **GRANTED** and Plaintiff's motion is **DISMISSED with prejudice.**

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**July 5, 2017**